NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250287-U

NO. 4-25-0287

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 12, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| LATAYUSS CURRY, | ) | No. 23CF266 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer Hartmann Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Zenoff and Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held:*  The appellate court affirmed defendant's sentence.

¶ 2     In July 2023, defendant, Latayuss Curry, an inmate at Pontiac Correctional Center, was indicted on two counts of aggravated battery, a Class 2 felony (720 ILCS 5/12-3.05(d)(4)(i), (h) (West 2020)). In September 2024, a jury found defendant guilty of both counts.

¶ 3     In November 2024, the trial court conducted a sentencing hearing and sentenced defendant to two concurrent 15-year sentences, to be served consecutively to the prison sentences he was already serving.

¶ 4     In March 2025, the trial court conducted a posttrial motions hearing and modified defendant's sentences to two concurrent 14-year prison sentences, which again were to be served consecutively to the sentences he was already serving.

¶ 5     Defendant appeals, arguing the trial court's hostility toward him denied him a fair

and impartial sentencing hearing. We affirm.

¶ 6                                I. BACKGROUND

¶ 7                                A. The Charges

¶ 8          In July 2023, the grand jury indicted defendant on two counts of aggravated battery, a Class 2 felony (*id.*). The State alleged that defendant, who was serving a prison sentence in the Illinois Department of Corrections (DOC), threw his urine on two correctional institution officers.

¶ 9                                B. The Jury Trial

¶ 10         In December 2023, the trial court conducted defendant's jury trial. The State presented testimony from (1) Michael George, an internal affairs investigator at Pontiac Correctional Center; (2) Correctional Officer Sean Brown; and (3) Correctional Officer Derrick Caudle. The State also presented surveillance video from the correctional center. The evidence showed the following.

¶ 11         On October 6, 2021, Correctional Officers Brown and Caudle were delivering food to inmates at Pontiac Correctional Center. When they arrived at defendant's cell, Brown ordered him to sit on his bed. Defendant complied, and Brown unlocked and opened the feeding hatch to pass the meal tray into the cell. Defendant then performed a "fast motion," jumping up and jamming his arm through the hatch to push a tray filled with feces and urine—which was already sitting inside the hatch—outward toward the officers. Brown attempted to deflect the urine and feces with his hand, but they struck his face and torso. The substances also struck Caudle on his left side.

¶ 12         Defendant did not present any evidence.

¶ 13         Ultimately, the jury found defendant guilty of both counts of aggravated battery.

¶ 14                                        C. The Sentencing Hearing

¶ 15          In November 2024, the trial court conducted defendant's sentencing hearing. At the beginning of the hearing, the court noted that it had received a presentence investigation report (PSI), detailing defendant's criminal history and noting his placement "in mental health treatment-oriented units due to an acknowledged mental illness." The PSI showed that defendant was 31 years old at the time of the trial and was serving multiple prison sentences, with a projected parole date of January 2065.

¶ 16          Defendant's criminal history included (1) a January 2018 conviction for aggravated criminal sexual assault, a Class X felony; (2) two January 2018 convictions for aggravated battery, a Class 2 felony; (3) two July 2018 convictions for aggravated battery, a Class 2 felony; (4) a February 2012 conviction for aggravated criminal sexual abuse, a Class 2 felony; (5) a February 2012 conviction for unlawful restraint, a Class 4 felony; and (6) a March 2011 conviction for retail theft, a Class A misdemeanor.

¶ 17          The State offered no other evidence in aggravation beyond the information contained within the PSI. Defense counsel offered no evidence in mitigation but noted to the trial court that defendant's projected parole date was actually in December 2064.

¶ 18          The State recommended that defendant receive 12 years in prison, consecutive to the sentences he was already serving, based on the evidence presented at trial and his violent criminal history, which mandated he receive a Class X sentence.

¶ 19          Defense counsel noted that defendant was in prison for 40 more years and was currently housed at Joliet Treatment Center for the treatment of his mental illness. Counsel requested six years in prison, which was the minimum possible sentence. Defendant did not give a statement in allocution.

¶ 20 The trial court began its oral ruling by noting that defendant was being sentenced on two convictions for aggravated battery, a Class 2 felony. The court noted that defendant was subject to mandatory Class X sentencing based upon his prior record and the statutory factors it was required to consider.

¶ 21 The hearing then proceeded as follows. (We have italicized the statements of the trial court that defendant contends denied him a fair sentencing hearing.)

"[THE COURT:] Here, there are a number of very strong aggravating factors. In addition, the seriousness of the offense I think, and nature and circumstances of the offense are noteworthy. For the life of me, I can't understand why people, specifically defendants and inmates in [DOC] think that it's appropriate to throw urine and feces at the guards, especially in this situation where it was unprovoked. And really it's a crime that requires time and thought. You have to save a container, you have to fill that container, then you have to hang onto that container until the guard comes to your door. So, it is not a spur of the moment, oh, shoot, I'm just going to throw this; I mean, it takes some planning on your part to do this. And in this particular case, the guards are just bringing you your dinner and you're upset about something and you take it out on these guards. I can't imagine anything more disgusting than having somebody throw their urine and feces at you for no reason whatsoever. It's childish, it's immature, it's completely disrespectful; and the State made a very good point when they said, look, if you can't follow the rules when you're in [DOC], when can you follow the rules[?] And I understand the guards, they sign up for stuff, right, they sign up to deal with unruly inmates, they sign up for the transport; they

- 4 -

don't sign up for somebody to throw their urine and feces in their face. No matter what happened, it is unacceptable, period, and I am *so tired of seeing it*, especially in a situation like this where it's completely out of the blue, no reason for it whatsoever.

*So, to me, deterrence is a very strong factor in aggravation*. So, we have the evidence that came out at trial, which I think is severe in terms of under the circumstances under which this happened when the guards are just delivering food and out of the blue this happens so, we have that. *And then we have deterrence, very strong factor in this case. It is absolutely unacceptable for this to happen, and I've been saying that for a long time this is not the first time I've been saying that*. And, you know, spitting is bad enough, that's bad; urine and feces is another level. And, you know, it's one thing to sit here and say, well, they signed up for it. Well, they don't sign up for it. Okay? Nobody wants that, nobody agrees, there is no amount of money that you could pay anybody to put up with that at work. Period.

*I'm pretty sure, [defendant], that you would not want somebody throwing feces and urine at you. I'm half tempted to start ordering the guards to save their urine and feces and throw it at an inmate who does it to them*. I think that is—

[DEFENDANT]: Just fucking shoot me dumb-ass bitch.

THE COURT: Well, that's fine, [defendant], if you want to say that to me, that's just fine. If you want to leave the courtroom we'll let you leave the courtroom; but you did it, and now you're going to have to pay the price for doing it. And I have to outline—

[DEFENDANT]:—that's fucking, you're are [*sic*] allowed to shoot me too, I don't know.

THE COURT: I have to state for the record the reasons.

So, go ahead and take [defendant] out of the courtroom—

Do you want to be out of the courtroom? Do you want to do that or are you going to keep your mouth shut and listen or do you want to be out of the courtroom?

[DEFENDANT]: (No response.)

THE COURT: All right. Take him out of the courtroom.

[DEFENDANT]: Not going, I—My sentence.

THE COURT: Well then, you be quiet and don't interrupt me and especially don't throw those kinds of words at me; that's another sign of disrespect on your part. Okay? I don't know why it is that you seem to think it's okay to treat people like that, it's simply not.

*So, deterrence is very strong factor in aggravation*. And, honestly, I kind of like that idea of letting the guards throw their urine and feces at the inmates. So, I'm thinking about whether or not I can order that. *Maybe I'll just collect my own and throw it the next time we're in court.*

Also, your prior record is strong factor in aggravation. Not only the record that's listed in the [PSI], which is lengthy and severe, I do agree with the State, not the longest record I've ever seen, but certainly a severe record of violence; I don't necessarily agree with [defense counsel] that you've done nothing since 2017. *** [T]here have been some issues within [DOC] that have required you to

be disciplined; and that tells me that, you know, again, you're not willing to follow the rules and procedures in the prison. I don't think it's likely to happen while you're in the public; and I don't think, based upon your record and your history, that there's any rehabilitative potential.

You know, I don't know what's possessing you to do these things. It's inappropriate, and we have to have people that comply with the rules of—

*What's he doing over there, just shaking?*

CORRECTIONAL OFFICER: Just shaking.

THE COURT: *All right. I don't want him to explode, take him out of here. Yeah, you're over there shaking your leg, you look like you're about ready to blow your head off.*

[DEFENDANT]: If I was going to blow my head, I would have did it already.

THE COURT: *All right. Well, you're going to just sit still, you're making everybody nervous in here that you're going—*

[DEFENDANT]: Yeah.

THE COURT: *I don't want you to, like, up and hurt somebody or try to jump on one of the guards or something. That's what you're making me think when you're sitting there, you're shaking your legs so fast that your arm's shaking.*

*Okay. So, deterrence,* prior record, seriousness of the offense. I think that, given the strong aggravating factors, *no mitigating factors because the defendant did not provide any evidence to probation,* so, I am going to sentence the

defendant to a term of 15 years on Count 1 and 15 years on Count 2." (Emphases added.)

¶ 22    The trial court ordered that defendant serve those 15-year sentences concurrently to one another and consecutively to the sentences he was already serving in DOC

¶ 23    D. The Hearing on Defendant's Motion To Reconsider the Sentence

¶ 24    In March 2025, the trial court considered and denied defendant's posttrial motions, which included his (1) motion to reconsider the sentence, (2) supplement to that motion, and (3) motion for a new trial.

¶ 25    When ruling, the trial court stated as follows:

"In regards to the sentencing, the State accurately points out that the time that the Court, when the Court was explaining its ruling to this defendant with regards to his sentence, it is the defendant who became disrespectful, not the Court. *The defendant was not only impatient with the Court but also extremely disrespectful and using vulgar language. It was following that language that the Court was a little bit more clear in regards to the basis for its ruling*. So, I do not think that the Court made disparaging comments directed towards this defendant or that anything was said during the sentencing hearing that would indicate this Court was—Let me pull up the actual language that was used. There was nothing to suggest that this defendant did not receive a fair and impartial sentencing hearing. I believe I was more than patient with the defendant. *He interrupted me and swore at me with very vulgar language several times*; yet, I allowed him to stay in the courtroom. So, I am not exactly sure why the Court explaining its ruling would rise to the level of this defendant not receiving a fair and impartial

sentencing hearing. So, the motion for reconsideration of sentence—well, strike that.

In addition, I would simply point out that the sentence appears to be beyond the range as required by the new case law; so, I am going to modify the sentence to 14 years since that appears to be the greatest sentence that he can receive for this sentence. So, that sentence of 14 years then is within the range prescribed by law. The Court considered all relevant statutory factors, the arguments of the attorneys; and I believe that the Court's ruling is appropriate under all of the circumstances of the case. And so, the defendant is, the motion for resentencing is denied, except that I will reduce it to 14 years in accordance with the case law that just came out." (Emphases added.)

¶ 26       This appeal followed.

¶ 27                                    II. ANALYSIS

¶ 28       Defendant appeals, arguing the trial court's hostility towards him denied him a fair and impartial sentencing hearing. We affirm.

¶ 29       As an initial matter, defendant concedes that he forfeited this issue for review both by failing to raise a contemporaneous objection at the sentencing hearing and by failing to raise it in a posttrial motion. See *People v. Johnson*, 2024 IL 130191, ¶ 40 (requiring a defendant to object and raise the alleged error in a posttrial motion to avoid forfeiture). Nonetheless, he contends that we may consider his sentencing claim under either prong of the plain-error doctrine. *Id.* ¶ 43. For the reasons that follow, we conclude defendant has not shown plain error under either prong; accordingly, we affirm his sentence.

¶ 30                      A. The Applicable Law and Standard of Review

¶ 31                                     1. *Plain Error Generally*

¶ 32          The plain-error doctrine allows reviewing courts to review a forfeited error if the error falls under one of the following two prongs:

> "(1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 20.

¶ 33          The usual first step in a plain-error analysis is to determine whether a clear and obvious error occurred. *Johnson*, 2024 IL 130191, ¶ 44. "That is true because if there is no error, then there can be no plain error." *People v. Maury*, 2025 IL App (4th) 220887, ¶ 93. " 'However, similar to the analytical framework we use to review a claim of ineffective assistance of counsel [citation], the first step of plain-error analysis is merely a matter of convention,' and we may begin the analysis in any order." *Id.* (quoting *People v. Bowens*, 407 Ill. App. 3d 1094, 1108 (2011)).

¶ 34                                     2. *Judicial Impartiality*

¶ 35          A trial court must conduct itself in a fair and impartial manner, and the court may not show bias or prejudice against either party. *People v. Moore*, 2023 IL App (1st) 211421, ¶ 115. Judicial restraint in the court's conduct and remarks is not limited to the presence of the jury but is required throughout all the court's dealings with the litigants who come before it. *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 80. "A sentencing hearing is fundamentally unfair—and due process is denied—when the proceeding is affected by judicial bias." *People v.*

*Rademacher*, 2016 IL App (3d) 130881, ¶ 47. This is so regardless of whether the ultimate sentence imposed was within the statutory limits. *Id.*

¶ 36       A trial judge is presumed to be impartial, and it is the burden of the party challenging the court's impartiality to overcome that presumption. *People v. Romero*, 2018 IL App (1st) 143132, ¶ 96. We view allegations of judicial bias or prejudice in context and evaluate the allegations in terms of the trial judge's specific reaction to the events taking place. *Id.* To show bias, a defendant must "demonstrate that the judge displayed 'active personal animosity, hostility, ill will, or distrust toward the defendant.' " *Id.* (quoting *People v. Shelton*, 401 Ill. App. 3d 564, 583 (2010)). Judges must be fair and dispassionate arbitrators above all else. *People v. Phuong*, 287 Ill. App. 3d 988, 994 (1997). Thus, any showing of bias against a party constitutes reversible error. *Id.*

¶ 37       Whether the trial judge's conduct requires reversal is reviewed *de novo*. *Romero*, 2018 IL App (1st) 143132, ¶ 96.

¶ 38                                B. This Case

¶ 39       Whether under either the first or second prong of the plain-error doctrine, there can be no plain error without any clear or obvious error. *Maury*, 2025 IL App (4th) 220887, ¶ 93. Because we conclude the trial court did not err, defendant's plain-error argument fails, and we honor his procedural forfeiture.

¶ 40       Defendant argues that the trial court judge's remarks during the sentencing hearing demonstrate she was not a fair, unbiased, and impartial jurist. He contends that this argument is bolstered by the 14-year sentence he received—the maximum allowable by law—which he characterizes as improper given the nature of the offense.

¶ 41       Although the trial judge's comments could have been more restrained, they do not

demonstrate bias against defendant. Her comments are a far cry from the sort of comments that demonstrated a trial judge's prejudice against defendants in the cases cited by defendant, such as *Phuong*, *People v. Montgomery*, 2023 IL App (3d) 200389, and *People v. Fisher*, 2023 IL App (4th) 220717, which defendant cites in support of his argument.

¶ 42 In *Phuong*, 287 Ill. App. 3d at 992-93, the trial court showed personal bias against the defendant based on her language and ethnicity, making sarcastic comments about her need for a Chinese interpreter and shaking her head " 'in Chinese.' " The court ultimately found the defendant guilty of retail theft, stating, " 'There's no question in my mind as to the guilt of the defendant with or without English.' " *Id.* at 993. The appellate court reversed, holding the judge's "numerous insulting remarks" established prejudice and deprived the defendant of a fair trial. *Id.* at 993-95.

¶ 43 Similarly, in *Montgomery*, 2023 IL App (3d) 200389, ¶ 32, the appellate court reversed and remanded for resentencing because the trial court "failed to hide its animosity toward [the] defendant." The appellate court provided the following explanation:

> "The court's animosity was laid bare in the sentencing hearing when it (1) mimicked [the] defendant's demands to the arresting officer, (2) referred dismissively to [the] defendant's wife, (3) envisaged a hypothetical prison scenario where it would personally discredit [the] defendant's claims of mistreatment, (4) criticized the arresting officer's patience in dealing with [the] defendant, (5) suggested the officer should have tased [the] defendant upon noncompliance, and (6) most disconcerting of all, stated it would have killed [the] defendant if it were in the store clerk's shoes." *Id.*

¶ 44 Likewise, in *Fisher*, 2023 IL App (4th) 220717, ¶ 40, this court remanded for

resentencing, noting the trial court judge's "remarks toward [the] defendant, [when] taken together, constitute a *tour de force* of sarcasm and scorn establishing the trial court's prejudice against [the] defendant." We noted the trial judge's numerous improper derogatory and sarcastic remarks regarding (1) the defendant's behavior in jail, (2) his decision to have a jury trial, (3) the sex offender evaluation, (4) the defendant's mother's death, (5) the fact that the defendant fathered many children, and (6) the defendant's limited intellectual ability. *Id.* ¶¶ 36-39.

¶ 45          Unlike the trial judges in *Fisher*, *Phuong*, and *Montgomery*, the judge's comments in the present case focused on the nature of the offense instead of any immutable characteristic of defendant, his exercise of rights, or the judge's personal disdain for defendant. Although her expression of disgust at defendant's act of saving excrement to throw at correctional officers tended toward the hyperbolic, her unfortunate comments reflected an understandable reaction to the specific nature of the offense—namely, the premeditated collection and weaponization of bodily waste against correctional officers. See *People v. Rennie*, 2014 IL App (3d) 130014, ¶ 29 ("[A] judge may consider the nature and circumstances of the offense, including the nature and extent of each element of the offense committed by the defendant.").

¶ 46          Furthermore, the trial judge in the present case did not indicate a categorical refusal to consider certain sentences for this offense. See *People v. Bolyard*, 61 Ill. 2d 583, 587 (1975) ("[T]he trial judge heard defendant's argument for granting probation and then expressed his opinion that perpetrators of such a crime should not receive probation."); *People v. Miller*, 2014 IL App (2d) 120873, ¶ 38 ("[T]he court wrongly believed either that first-offender probation was unavailable because defendant did not plead guilty or that defendant should be denied first-offender probation because of the court's personal belief that only those who enter plea agreements should have that option."). Instead, the judge's statements in this case that she

was tired of seeing this specific type of offense merely emphasized the need for deterrence, given the frequency of these attacks within DOC generally and Pontiac Correctional Center specifically—a statutory factor in aggravation she was required to consider (730 ILCS 5/5-5-3.2(a)(7) (West 2024)).

¶ 47 Regarding defendant's assertion that the trial court improperly emphasized deterrence to the exclusion of his mental health mitigation, we note—as did the trial court—that the only "evidence" regarding his mental health was a brief statement in the PSI indicating that defendant was placed "in mental health treatment-oriented units due to an acknowledged mental illness." However, the specific nature of his condition was entirely unknown to the trial court due to defendant's refusal to cooperate with the presentence investigation, which resulted in a PSI showing only defendant's lengthy criminal history. Defendant cannot decline to provide potentially mitigating evidence and then complain on appeal that the trial court failed to consider the very information he withheld.

¶ 48 Regardless, as we have emphasized on many occasions, the "existence of mitigating factors does not require the trial court to reduce a sentence from the maximum allowed." (Internal quotation marks omitted.) *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 42 (quoting *People v. Pippen*, 324 Ill. App. 3d 649, 652 (2001)). Moreover, we are not convinced that this factor is entitled to the mitigating weight defendant claims. See *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 104 ("The weight to be given to any proper factor *** is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." (Emphasis omitted.)). Indeed, this court has regarded mental health issues as a " 'double-edged sword,' " which the trial court is free to consider either in mitigation or aggravation. *People v. Brunner*, 2012 IL App (4th) 100708, ¶ 61 (citing *People v. Coleman*, 183

Ill. 2d 366, 406 (1998) ("[T]his court has repeatedly held that information about a defendant's mental or psychological impairment is not inherently mitigating." (Internal quotation marks omitted.)).

¶ 49     The trial court's statement that there was no evidence in mitigation at the start of its discussion of defendant's sentence is entirely consistent with the view that the vague statement in the PSI regarding his mental health was of no mitigating or evidentiary value to determining defendant's sentence. We presume that the "trial court based its sentencing determination on proper legal reasoning, and *** consider the record as a whole, rather than focusing on a few words or statements by the trial court" (*People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 22), and defendant has failed to overcome that presumption on appeal. See *People v. Williams*, 2019 IL App (1st) 173131, ¶ 21 ("The defendant bears the burden of making an affirmative showing that the sentencing court did not consider the relevant factors.").

¶ 50     Finally, although we agree with defendant that a judge "should be patient, dignified, and courteous to litigants, jurors and witnesses, lawyers and others with whom he deals in his official capacity" (*People v. Eckert*, 194 Ill. App. 3d 667, 674 (1990)), the trial court's comments in this case pale in comparison to the personal vitriol displayed in *Fisher*, *Montgomery*, and *Phuong*. We note that "[s]entencing hearings do not occur in a vacuum, and the duty to impose a fair sentence entails an explanation of the court's reasoning in the context of the offenses of which a defendant has been convicted." *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 15. "Indeed, a sentencing hearing is likely the only opportunity a court has to communicate its views regarding the defendant's conduct." *Id.* Although we do not endorse the trial court's specific comments in this case, we continue to encourage such explanations for the benefit of defendants and to aid in our review on appeal.

¶ 51    Ultimately, defendant received a fair hearing and a sentence within the statutory range for a Class X felony. Because the trial court committed no error, defendant's plain-error argument fails, and we honor his procedural forfeiture.

¶ 52                                III. CONCLUSION

¶ 53    For the reasons stated, we affirm the trial court's judgment.

¶ 54    Affirmed.